HAKES v. RUSS et al.

(Circuit Court of Appeals, Sixth Circuit. January 4, 1910.)

No. 1,975.

1. BILLS AND NOTES (§ 58*)—VALIDITY—FAILURE OF OTHERS TO SIGN.

A maker of a promissory note, who signed the same under an agreement by the payee that it should not become effective unless signed by certain other persons as joint makers, is not bound thereon to the payee, where he did not obtain the signatures of certain of such persons, but instead accepted from them cash payments equal to their proportion of the note, which he indorsed thereon.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. § 104; Dec. Dig. § 58.*]

2. ALTERATION OF INSTRUMENTS (§ 8*)—MATERIALITY—INDORSEMENT OF CREDIT ON PROMISSORY NOTE.

A credit indorsed on a promissory note by the payee without the knowledge of a maker is not in itself a material alteration, which invalidates the instrument as to such maker.

[Ed. Note.—For other cases, see Alteration of Instruments, Dec. Dig. § 8.*]

3. BILLS AND NOTES (§ 537*)—ACTIONS—QUESTIONS FOR JURY.

The question whether the plaintiff in a suit on promissory notes was entitled to protection as a bona fide purchaser for value without notice of defenses held, under the evidence, properly submitted to the jury.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. § 1879; Dec. Dig. § 537.*]

In Error to the Circuit Court of the United States for the Eastern District of Michigan.

Action by Elisha H. Hakes against Ode A. Russ and others. Judgment for defendants, and plaintiff brings error. Reversed.

This was an action upon three promissory notes, two for $850 each, and one for $800, all dated October 30, 1899, payable, respectively, September 1, 1901, 1902, and 1903, to Russell Iams, or order, with interest. The notes were given for the price of one Percheron stallion, and were indorsed by Iams to the plaintiff in error. The payors who actually signed these notes were 21 in number. This suit was against 20 of these. Upon the back of each note there was an indorsement in these words: "A credit of $100.00 cash paid on this note October 30, 1899." Immediately below this follows another indorsement in these words: "For value received, I hereby guarantee to pay on the within note and waive all demand of notice and protest on same when due. I to pay all collection charges on same. Russell Iams." Iams was a dealer in horses. Through his agent, John Crawford, he negotiated a sale of this horse for $2,500 to a voluntary association called the Ypsilanti Horse Breeding Association,

the shares to be for $100 each. Iams was to issue, and did issue, to each member of the association a certificate in the following form:

"Capital Stock, $2,500.00. No. 23. No. Shares, 1.

"Certificate of Stock.

"This is to certify that we have received of ———— his notes for one hundred dollars in full payment for his one share of one hundred dollars each in the recorded stallion named Orleans No. 1,224. Dated at Ypsilanti, county of Washtenaw, state of Michigan, this 30th day of October, 1899.

"[Signed] Russell Iams."

One member took two shares; the rest one. Contemporaneously there was also executed and delivered to some one of the members of this association a paper writing in these words:

"Gibsonburg Importing Barn.

"Russell Iams,

"Importer and Dealer in Percheron and Coach Stallions.

"Gibsonburg, Ohio, October 30. 1899.

"This contract, made and entered into by and between Russell Iams, of Gibsonburg, Ohio, a party of the first part, and the Ypsilanti Horse Breeding Association. a party of the second part, witnesseth: That whereas, I, Russell Iams, of Gibsonburg, Ohio, the party of the first part, have this day sold and delivered to the Ypsilanti Horse Breeding Association, the party of the second part, one certain coach stallion known as Orleans No. 1,224, I, Russell Iams, do hereby guarantee said stallion to be a sure foal getter, also a reproducer of colts. If said stallion fails to fill his contract, I, Russell Iams, do hereby agree to take back said stallion by the 1st of September, 1901 (nineteen hundred and one) and return to said Ypsilanti Horse Breeding Association their notes or money, or replace him with another horse of the same breed and price, upon delivery of the above-named stallion at Gibsonburg in ordinary good condition as he is at present. [Signed] Russell Iams."

On the back of this paper is found the following:

"This contract controls this sale and sets all conversations aside before and hereafter. Russell Iams, by John Crawford."

There was a jury, and verdict for the defendants.

Joseph H. Clark, for plaintiff in error.

Lee N. Brown and John P. Kirk, for defendants in error.

Before LURTON and WARRINGTON, Circuit Judges, and SANFORD, District Judge.

LURTON, Circuit Judge (after stating the facts as above). The errors assigned are something more than 100—many are repetitions. We shall content ourselves with a consideration of only such as are necessary to the determination of the principal questions involved.

1. There was evidence tending to show that the horse for which the notes were given did not respond to the warranty found in the written contract of sale, made and delivered contemporaneously with the notes in suit and set out above. One term of the contract of sale, as set out in the statement of the case, gave to the purchaser the right to return the horse by September 1, 1901, if the horse should not come up to the terms of the guaranty, and obligated the seller, in that event, to "return * * * the notes or money, or replace him with another horse of the same breed and price." The purchasers did return the horse under this contract, and thereupon Iams executed and delivered an

agreement to replace the horse so returned by another "of the same breed and price as the stallion 'Orleans,'" by a date therein named. There was evidence tending to show that by the date named another horse was sent and delivered at the public livery stable of Westfall, one of the defendants herein. This horse was rejected at once, as not in any sense complying with the agreement, and was finally sold for an insignificant sum to pay for his keep at the stable in which he had been placed by Iams. There was also evidence tending to show that the defendants were within their rights in refusing to receive this second stallion "as a horse of the same breed and price as the stallion Orleans."

The agreement last referred to, by which Iams accepted a return of the stallion and elected to deliver another horse within the time named, did not change or alter the original contract, and this was specifically expressed in the later contract. This, indeed, was in precise accordance with the original contract. If, therefore, Iams did not replace the original stallion with one of equal breed and price, he became obligated to return the notes here in suit and the money which he had received. It was, therefore, a question for the jury as to whether Iams had replaced the original animal by another of equal breed and price. If he had, he had carried out his contract, and either he or his assignee had a clear right to recover upon the notes for the price, unless the other defenses to be later considered will prevent an action upon the notes and compel a resort to another remedy.

2. Another defense referred to was that the payee in the notes had himself obtained the several signatures of the defendants sued upon a representation that the notes would be signed by 25 good and solvent makers, and that he had without their knowledge or consent relieved 3 of the joint purchasers from signing the notes upon the payment to him of $100 each, which payments are indorsed on the notes as of October 30, 1899. There was evidence tending to show that several of the makers were not solvent, and that 3 solvent members of the purchasing association had been relieved from signing upon the payment of $100 each to Iams. The notes themselves show each note to be credited with a payment of $100 under date of October 30, 1899. There was also evidence tending to show that these credits were not upon the notes at the time the defendants signed, and also evidence that many, if not all, of the makers were ignorant of the fact that the notes had not been signed by 3 of the members of the association to whom the horse had been sold and to whom Iams had issued shares of stock as members of the buying club.

It is obvious that, if the defendants signed the notes in suit when presented by Iams to them individually upon an agreement that the contract was off unless he procured the signatures of 25 solvent makers, those who did sign are not bound by their signatures, unless they subsequently consented, with knowledge that this condition had not been complied with. Such a change in the contract was a most material one, for it enlarged the liability of each solvent signer by diminishing his right of protection by way of contribution from those who did not sign, or who had signed and were not solvent. See Smith v. United States, 69 U. S. 219, 17 L. Ed. 788, where the principle in-

volved is discussed, and 4 Am. & Eng. Ency. of Law (2d Ed.) p. 205, where many cases are cited.

3. From the facts stated it is obvious that there was material evidence upon both of the defenses presented, and the motion for an instructed verdict for the plaintiff was properly overruled, unless it shall appear that the defenses mentioned were not open in a suit upon the notes by the plaintiff who claims to be an assignee for value before maturity and without notice, a matter which will be considered later.

4. This brings us to the question as to whether the plaintiff was a purchaser for value, before maturity and without notice of the defenses mentioned. The plaintiff in error submitted two special interrogatories to the jury. These questions and the responses of the jury were as follows:

"(1) Did the plaintiff, Elisha H. Hakes, purchase these notes from Russell Iams on the 21st day of November, 1899, as testified to by him? No.

"(2) Were the receipts for this $100 paid on each note indorsed thereon when Le Ferge signed the notes? No.

"We answer these above questions No."

It is now urged that the court below should have granted the motion for a peremptory instruction for the plaintiff because there was no material evidence impeaching the title of the plaintiff as an innocent purchaser for value. An examination of the transcript does not bear out this insistence. While the plaintiff did testify that he bought these notes on November 21, 1899, paying for them the price of $2,000 in cash, and that he then had no notice whatever of any defense, there was, opposing this, evidence that in June or July, 1900, he visited some of the defendants to make inquiry about the notes, and that he was then told in substance that the horse had not come up to representations, that the purchasers had been defrauded, and that the notes had been signed by the defendants upon the conditions above referred to, and that some of the makers were not solvent, and that others who were members of the association had been relieved from signing at all. There was also evidence tending to show that upon receiving this warning plaintiff said that, "if that is the case, I will have nothing to do with them," a statement from which, in connection with other circumstances in evidence, a jury might infer that he had not theretofore bought and paid for the notes, as he had testified. There was no error in refusing a peremptory instruction for the plaintiff.

5. There is an assignment of error based upon an exception to the charge which must result in a new trial. It is concerning the effect upon the notes in suit of the credit for $100 which appears upon the back of each note under date of October 30, 1899. The fact that this credit was placed upon the notes after they had been signed, and without the knowledge or consent of the makers of the note, was claimed to be such an alteration as avoided the notes. Upon this the court said:

"The effect of those indorsements would be to reduce the liability of the makers; but it is an invariable rule of law that an alteration made in a promissory note voids it entirely. There can be no recovery on that instrument. There may be recovery for the consideration, as between the parties, but not upon the instrument; and this was a suit here upon the notes; and, if so, if such alteration was made as Mr. Le Ferge testifies—and that is a fact for you to decide, whether Mr. Le Ferge's testimony is credible and trustworthy as to

that—then that was an alteration which voids these notes, and there can be no recovery upon them."

Such a credit is not like a change in the amount of the principal of a note or bond, and cases which hold that a reduction of the amount of an obligation after signing is a material alteration are not in point. A credit for a payment made upon a note is an immaterial alteration; that is, one which does not have the effect of changing the legal significance of the instrument. 2 Am. & Eng. Ency. (2d. Ed.) p. 185; Smith v. Crooker, 5 Mass. 538; 2 R. L. 345. If such a credit was the result of an agreement to relieve other purchasers of the horse from signing the joint and several obligation for the price, as there was evidence tending to show, then this failure to have the note signed by all the purchasers, according to the alleged agreement with each of those who did sign, would be a material change in the contract.

The legal effect of the failure of the payee to procure 25 signers was fully and correctly stated by the trial judge to the jury; but we fail to find that the earlier statement as to the legal effect to be ascribed to the mere entry of a credit upon the back of these notes is corrected or cured, although enough appears to indicate that the trial judge meant to give such effect to such a credit only because the payment had been received in lieu of joinder in the note as maker. It may be that as between themselves each of the members of the purchasing association was to pay but $100. If each made such a payment, the entire purchase money would be paid, and none would pay more than his share. But the seller did not choose to take from each an individual note for $100. He required that every one of the club should join in one note for the whole price. This would make each maker liable to him for the whole sum, and he who overpaid could only protect himself by invoking his right of contribution. Now this right of protection by contribution made it important that every member of the association should become a maker and that each should be able to pay his part. Hence, the representation that 25 good names should be secured was material.

6. It has been urged that there was evidence that the defendants ratified or adopted the note as signed by themselves alone, and waived the effect of the fact that three purchasers did not join in the note who were expected to join, and that the court did not charge upon the subject, and refused to charge a request upon the matter of waiver or ratification. If the defendants, after full knowledge of all the facts as to the failure of some of the members of the association to join in making these notes, agreed to be bound, and ratified the notes as their act and deed, this subsequent ratification would have the effect of a previous agreement to deliver the notes without the names of those who had been relieved. There was some evidence bearing upon the question. But the plaintiff's fifth request was properly refused, for it took no account of the question of the knowledge of the defendants of the facts about the nonsigning of the notes by the other purchasers, nor of any of the other circumstances of the case, and based ratification or waiver solely upon the fact that the horse was kept and used until returned when found unfit for stud purposes.

7. It was not error to refuse the requests numbered 3, 4, and 6. They are all subject to the objection that they called for a peremptory instruction based alone upon particular facts of the case not in themselves conclusive.

8. Many errors upon the admission of evidence of the doings and sayings of Crawford about the substituted horse, when he does not appear to have been either the agent of Iams or Hakes, have been referred to in brief of counsel. What Crawford said about the horse sent to replace the original stallion was not competent to affect the plaintiff in error, unless shown to have been his agent. No ground was laid to contradict him as a witness. We need not particularize, for to do so would extend this opinion unduly. The general rule we refer to should govern the court upon a new trial.

For the errors indicated, the judgment must be reversed.

NOTE.—This case was decided and the opinion prepared by Judge LURTON while a member of this court. The decision was announced by Judge WARRINGTON.